Good afternoon, your honors. May it please the court. My name is Roger Roots and I represent the defendants and appellants in this case and the movants in this particular proceeding, Erwin Spruth, Michael Spruth, and John Rowley. The Spruths are both brothers. All three of these defendants are serving lengthy federal prison sentences right now. They've all been locked up more than 15 years at this point. And when are they now scheduled to be released if we don't give relief in any respect? The Spruth brothers, I believe, are both serving 24-year sentences. They've been in at least, I think, 16 years. I think their release date is in 2016, it said in the briefing, with time earned. This is an unusual case, obviously, in many different respects. And this is an unusual motion in many respects. As you know, there was hearings more than 15 years ago in the Eastern District of California under Judge Carlton who conducted hearings on the defendant's motion to dismiss for outrageous government conduct. This was a methamphetamine manufacturing and related issues kind of case. And both the Spruth brothers had previously had methamphetamine manufacturing, shall we say, convictions on their jackets. And so they had been sort of surveilled and had been tracked by the California State Bureau of Narcotics Enforcement. And the argument for outrageous government misconduct involved a reverse sting operation, actually a series of reverse sting operations, in which the California State Narcotics Enforcement agents had actually provided the precursor chemicals for a very large meth manufacturing enterprise that really unleashed, let's just say, hundreds of thousands minimum, possibly into the millions of doses of methamphetamine, ultimately, into the greater California community and possibly nationwide. Now, Judge Carlton did find that there was outrageous government conduct in that proceeding. However, he did not dismiss the indictments against any of the three defendants on grounds that they lacked standing, that they weren't victims of the outrageous government misconduct because they were, you know, they had been pulled into the meth manufacturing business and that they weren't victimized by it. Well, not that they were pulled into it, that they were already in it. Yeah, that was the finding. It went up on direct appeal to this Court of Appeals, and this Court of Appeals sort of changed the question in some ways and ruled that it was a question of due process. Were the defendants denied due process by the outrageous conduct or by the conduct of the California narcotics agents? This Court of Appeals upheld the convictions and sort of changed the, again, they suggested that there hadn't been outrageous government misconduct. What has really made this case interesting is the fact that we now know from subsequent events, especially California State, Trinity County, California, grand jury inquiries that were launched by the, actually I have the foreman here who's arguing pro se or arguing as an amicus curiae friend of the court along with me. He was the foreman of the Trinity County grand jury at that time who looked into the reverse sting operations of the defendants. I'm sorry. Let me, I apologize for interrupting you, but the premise for your motion here is fraud on the court, which is hard to show. You might have read our fairly recent opinion of Stonehill, which sets out how difficult it is to show. Judge Carlton, in the motion in front of him, first time around, but you've already described, knew a lot of this. My question to you is what do we know now or what evidence do we have in front of us now that was not in front of Judge Carlton? Well, it turns out Judge Carlton actually was just scratching the surface because it has been revealed in subsequent events and subsequent investigations. I'm just going to pound on five things. There are actually a wide variety of misstatements that were made by the four California state agents who testified against the Spruce and Mr. Rowley in the original proceedings. Number one, this court of appeals found that there was not outrageous government misconduct, in part because the defendants were already engaged in the manufacture of methamphetamine. The agents who testified were very well choreographed on that point. However, the grand jury looked into that question and found that there was no evidence that there was the ---- But, counsel, the grand jury looked into it and came to a different conclusion. It's not a fraud on the court. They chose to believe that the defendants, what the defendants said was true. Judge Carlton chose to not believe that what they said was true. And we found that that was a reasonable interpretation. I mean, just because one of your clients said, I can't make pure meth from pseudoephedrine, so I didn't do it, doesn't mean he didn't do it. And, you know, as a trial judge, I've had many cases involving manufacture of meth where they did not have ephedrine but were using all clear and pseudoephedrine and all those products that you could get at pharmacies. I had a case with a little mom-and-pop store in Chehalis, Washington, that sold more pseudoephedrine than the entire Bartell drugstore chain, hundreds of stores. So, you know, there were people out there manufacturing quality meth from pseudoephedrine. Just because your clients say they didn't doesn't mean we have to believe that. And just because the grand jury came to a different conclusion doesn't mean we have to believe them, does it? Well, I should point out that Judge Carlton did not find that the defendants were previously involved, had already had an operational methamphetamine operation going. Well, he said if the question of whether the defendants were engaged in the manufacture of methamphetamine at the time of the initiation of this investigation were determinative, the Court would find that they have not borne their burden on that issue. They did not prove that they were not, so he found that they were, and we supported that finding. Most pertinent to this question is the transcripts that have become known later that were investigated by the Trinity County Grand Jury. Fifty-three separate transcriptions showed that John Roger Rowley had no meth, no cash, that this operation that the government claimed existed did not exist. And on the initial reversal of the transcripts, When you say 53 transcriptions, you mean things that the defendant's attorneys had at the time of the trial. They were not part of the record of the motion to dismiss, and they did not go up in the initial direct appeal. But those are self-serving statements by a drug dealer who's negotiating with a supplier. Everybody lies in those circumstances. What's interesting is that these defendants were under surveillance for a number of months, five months, I believe, five or six months. The narcotics agents did everything they could do to find evidence that they were in a manufacturing operation. You're retrying an issue that was tried 14 years ago by quality federal public defenders who had all the material that you're talking about now and fought hard and got a U.S. district judge to excoriate the cops for what they did, calling it outrageous, but didn't think that the defendants were entrapped or that their due process rights were violated by the conduct. So don't tell us what we already know. Tell us what we don't know. Tell us what the fraud was. Here's one of the most important aspects of our motion right now. The concealment of the policy manual that the California Narcotics Bureau was governed by, they testified in the Carlton proceedings 15 years ago that the policy does not require that they recapture all of the methamphetamine that is manufactured by the precursor chemicals they provide. We now know that they were sitting on that manual, and it was revealed only later on. By the way, this is a manual that should be on the shelves of the library. Instead, it took a motion, it took a subpoena from a state judge to get this manual, and we now know why, because it contradicts at least three material points that these narcotics agents testified to in the original hearing. They testified that all they had to do is make a good-faith attempt to recapture the methamphetamine that was manufactured. In fact, there's a zero-tolerance policy for releasing even a single ounce of methamphetamine in that policy. They also testified that they're not supposed to be using – I'm sorry, they testified that there was no bar on them using – going after – well, the policy manual clearly states that there has to be major violators in order to stage a reverse sting operation. They testified – clearly, the Spoons were not major violators. They weren't even violators. They weren't even in the business. What I'd like to do, just in the interest of time, if I could, Your Honors, is have Dr. Koch quickly summarize the grand jury proceedings and the findings of those grand jury proceedings, and I'd like to reserve a few minutes of rebuttal afterwards. Before you sit down, we're going to make sure everybody gets a chance to say what they need to say. I'm – roughly, of Judge Lasnik's point of view, what I'm interested in is what new evidence are you now seeking to put before us that was not in front of the district court or not available to the public defender, that the grand jury might have come to a different conclusion based on roughly the same evidence doesn't make any difference to me. So I'm interested in what evidence there is rather than a different conclusion that the grand jury came to. So we've got the manual. I got that part. What else? Well, the number of doses. Using the best – Level best. Using the level best – We did our level best. Using the best sources on calculating how many doses can be made from a number of ounces or pounds of a particular precursor chemical, we now know that the number of doses that were released upon the community and upon the country were probably misstated by a factor of maybe 40 times less than what was really released. So these agents testified to a much, much lower amount than – And they testified to what? You know, I should have Dr. Cope address that specifically. And I would like to reserve a couple minutes of rebuttal afterwards. Okay. Thank you, Dr. Cope. Thank you. Good afternoon to the court. I'm William Cope from Trinity County, California. I would like to answer your question, and I'm sorry I don't know your name, but out of the court record it was asked whether these agents surveilled these defendants, and right out of the court record they say, No, we don't know of the purchase that they made during that period of time, meaning six to eight months prior to the start of this operation. So I just wanted to answer. And you're reading from the record before the district judge in 1998? Yes. Correct. Right. And we want to know what new information, not information that he had, what new information. I just wanted to answer your question. The grand jury received a complaint, and we looked into this case, and we served as the conscience of society. What we uncovered in this case was that the Bureau of Narcotics Enforcement and the Chasta Interagency Narcotics Task Force, with foreknown knowledge, so I don't know if that's new in this case or not, but Judge Carlton asked these agents in his courtroom, Were you aware before you started this case what you were going to do? And the answer was yes. So they knew in advance that they were going to go into this cooking, meth cooking enterprise, and as a result of that their intent was to have this released to the public, all of this methamphetamine, in which we followed it through to 125,000 doses that were released to the public, and we found that shocking. We think it's unconscionable. Now, I share a sense of outrage, and indeed Judge Carlton shared a sense of outrage. Yes. The question in front of us is not whether this was bad behavior. The question in front of us is, was there fraud committed upon the court? What we looked at was that the agents went to the court and asked for an order in order to proceed with this reverse sting operation, and they did not tell the truth of what their intent was at that time, and that's what we believe is fraud of the court. They went to the court for permission to proceed? You're required to get an order from the court in order to follow the health and safety code and the B&E manual. You can correct me if I'm wrong. I think they had to go in front of the state court for that. Is that correct? That's correct. So what I'm after is what information was not in front of Judge Carlton, the district court, at the time of the prosecution? When he became aware of that fact, that these agents did not tell the truth when they got that original order, then he asked the agent, we discovered that in the testimony of the grand jury, and Judge Carlton asked the agent, were you aware in advance of what you were doing? The agent said yes. And as a result of that, that's when we believe Judge Carlton understood that fraud had occurred. But the problem I've got, and for fraud on the court, in order to show fraud on the court, you've got to show not only that people lied in front of the district judge, because that happens a lot. It has to be such a lie that the district judge didn't understand that it was a lie. We believe that. And that the lie was so thoroughgoing and typically involving people in the government, sometimes even the prosecutor, although that's not essential, that the adversary process was simply prevented from functioning. So to the extent that you say, well, Judge Carlton knew it, that doesn't get us to fraud on the court because that means he knew it already. Okay. We believe that the judge was not aware at the time that the original order was signed. When we went back through the case, we knew that the agent's own testimony said that they committed the fraud. Judge Carlton understood that fraud with his statement that he read in court. Okay. You may be too young to remember Ms. Simpson was the former attorney, but all of us remember being appalled at my age, remember being appalled during the Vietnam War when a major colonel or whoever he was said we had to burn the village to save it. He said, here we are. How many people got started on methamphetamine that wouldn't have but for the conduct of these agents? In our minds, that absolutely proved it. It was not known prior, but through the court proceedings, they found out what the agents had in mind. And he went on to say, I mean, there may be some child out there who is dead because of what happened here. Yes. I think I understand that. What I'm interested in, and I'm trying to help you help us, what information came to the grand jury that was not information that had been available to the defense or had been put before Judge Carlton? What new information or new evidence did you get? We received testimony that the agents surveilled these people for six to eight months prior to the start of this operation. And we believe that the evidence showed that they supplied 10 pounds of ephedrine, which is a restricted chemical in our state system, and they did not tell the judge that. They supplied it and went into a cooking operation, co-conspirators, as it were, with the Spruce and the Raleigh. We believe that was not known prior. They gave them 55 more pounds of ephedrine, and if that wasn't enough, they gave them 55 more pounds of ephedrine, all to cook with the intent, which the judge didn't, we believe the judge did not know. Which judge are you talking about? Are you talking about the state court judge? That would be Carlton, Judge Carlton. That they had in their minds, we now know because we believe the agents lied to the original judge and also to Carlton, that this methamphetamine was going to be used to go to the public. They were going to, in the co-conspirators and a co-business operation, to cook this meth, to allow it to go to the public in order for the B&E to collect that money that they would collect at the end. That's what we believe is new and was not known during the trial. As a result, they were surveilled through this whole time, and the B&E agents could have stopped and were required to stop, according to the Health and Safety Code, this operation in order to collect back the meth, which they did not do. And the reason they did not do, the grand jury found out, was that they wanted to allow the meth to be sold to the public in order to collect the money back. We also discovered that about 125,000 doses were released. We took testimony from our own county sheriff, and he told us that 50 doses was about the amount that's required to cause a person to become an addict. And if you divide those two out, then it would be about 2,500 people became addicts as a result of this operation. 250 of those were arrested, 62 were incarcerated, and two or three people died as a result. We don't know how many actually sought medical attention, but the cash that was generated was $2.5 million. We believe that it took about $25 million of mayhem to be perpetrated on the public in order to convert it to cash to buy all this methamphetamine. The cost of incarcerating these people, of arresting them, convicting them, prison time, deaths, the cleanup to our county, the residue from the cooking operation is a carcinogenic material. It was dumped on the land and into the river, Trinity River, and polluting all of those. Now, were you a civil grand jury? We were a civil grand jury. But you nonetheless under California law have the power of indictment? Under the state, yes. We sought that we could do that from our grand jury association, yes. And you did, in fact, hand up indictments for a number of individuals. I'm sorry. The grand jury did, in fact, hand up indictments on a number of individuals. We wound up 100% vote yes, indicting the 32 officers involved. And the state refused to prosecute, is that correct? We turned that over to the district attorney. Yeah, and no prosecutions resulted. And no action occurred to that as a result of that. Yeah, that's right. And then we were given this back, the indictment back. And we decided to publish then the final report and follow that up, which is what we're actually doing today. Right. On the website of the Bureau of Narcotics, this would be new information, that the Bureau of Narcotics Enforcement touted all over the state that they were conducting these types of reversing operations. And the grand jury asked the question, is the largest single producer of methamphetamine in the state of California? The state of California, as a result. We think that this is unconscionable action by these agents. Well, and Judge Carlton, that wasn't quite his word, but I think Judge Carlton essentially agreed with you. He agreed. Yeah. And the final statement that the grand jury said, never is a correct assessment of when law enforcement authorities can properly and legally employ a reverse sting that may chemically expose our citizens. We wonder, as a result of this Spruce case and also the other case called the Karen Malko case, chronicled in the citizen's complaint investigated by this grand jury and also the next grand jury that came after us, how many methamphetamine addicts were created, how many of our citizens may have died or will die as a direct result, and what potential liabilities were created for Trinity County. This is, I think, not necessarily in the record in front of us, but I'm nonetheless interested in knowing, do you know whether the investigation and reports of the grand jury have had any effect on the operation of B&E since that time? Actually, we do believe that there has been an effect, and we do believe that the current governor, who was the attorney general under who these people worked out of his office, released a report the very day that we turned in our report, and we don't think that's coincidental that they are now defunding the Bureau of Narcotics Enforcement. And there may be a causal relationship between the release of the report and that. Yes, we absolutely believe that part of what we have done is to cause that. We did ask the attorney general for a copy of this famous or infamous manual, and we were refused that under the Information Act, Freedom of Information. But in their refusal, they said that the reason is that this manual is now being used nationwide. And so we are saying the very thing that we complained about and we found that these B&E officers were performing illegal actions is now being touted and trained law enforcement nationwide. We believe that should be stopped absolutely. Well, it sounds as though, however, that the manual had a very different policy from what the B&E people actually did. Was not followed. So if the manual is being followed, that may, in fact, be appropriate. The manual, we found that the manual was not being followed. Correct. Also, the health and safety code was violated. Right. I understand that. But what I'm saying is in response to what you were just saying about the manual potentially being used nationwide, as to which I don't know one way or the other, if the manual is being followed, that sounds like a good thing rather than a bad thing. Yes, but if it's being followed to cause illegal methamphetamine to be cooked nationwide, we think that's an extremely bad thing for the citizens of this country. I understand that. Yes. We would like for an accounting of this sweet money that these agents supposedly got, and we would like for that money to be returned to the citizens of Trinity County. Also, to be repaid for all of these expenses that we have put together here, which amount to some $250 million of expenses. And I've said here that we think that these officers who are operating under the color of authority of the badge and also officer of the court should be held accountable for what they have done. Okay. Thank you very much. You've saved about, oh, just a little under three minutes, but we'll make sure that you get a chance to respond. Good afternoon, Your Honors. May it please the Court, Phil Ferrari for the United States. I want to start by addressing some of the things that were set forth as not being in front of the district court when it ruled originally in this case. And so it was stated earlier that transcripts, well, first it was stated that the transcripts became known later, and then it was said that they were not in the record. While it's true that the transcripts of the 53 recorded conversations were not themselves physically made part of the record put before the district court, what was put before the district court by the defendants was an extensive statement of facts, which cited repeatedly to those transcripts. It also cited to the law enforcement reports which were produced prior to the hearing. There was also a document that set forth important quotes selected from those 53 recordings. That was a separate exhibit that was also put before the district court. Both of those documents were put before this court as well. They were part of the appellant's excerpt of record. And certainly we may infer from that that defense counsel had those. Is that, do we know anything beyond the ability to infer that defense counsel had these transcripts?  No, Your Honor. They have base numbers on them. They were referred to throughout the hearing before Judge Cross. So if we're talking fraud on the court, the fact that they're handed over to the defense counsel and defense counsel makes use of them, that sounds as though that at least is not fraud on the court. That is our position, Your Honor. It's our position that at that point the defendants are left to argue at most perjury, which under this court's precedence is not sufficient to be fraud on the court. What about the manual? I mean, that sounds to me as though they were not entirely forthcoming. Well, Your Honor, two things with respect to the manual. The first thing is that the letter that was appended as Exhibit A to the government's response before Judge Carlton, which set forth the criteria for the use of precursors in reversals, that section of that letter, if you compare that with what is actually in the manual as submitted by the appellants today, you'll see that with the exception of maybe three words, and there's actually an additional sentence in the letter that is not in the manual, with those exceptions, it's the same verbatim. So as far as when you look at the actual 8.45 on reversals and what actually refers to the criteria for the use of precursors, what is in that manual was put before the district court. Now, what wasn't put before the district court was a number of other provisions within the manual that deal with the use of controlled substances, any number of procedures that have to be followed if you're going to use actual controlled substances in your reversal. Ephedrine is a list one chemical. It's not a controlled substance. Maybe most relevant, though, in terms of this point is that if you read the district court's opinion, there is no question that Judge Carlton found, based upon both what was submitted in Exhibit A to the government's motion and what was put forth in terms of testimony at the hearing, that the policy did have any number of the provisions that the appellants are claiming it had now. Judge Carlton, in fact, found that the agents, in his opinion, did not abide by that policy. So it's difficult to understand how fraud occurred with respect to the agents not following that policy when, in fact, that argument was made and the judge agreed with it in the district court. Well, they knew that they were going to, from the precursor that was provided, that they were going to manufacture meth, correct? Oh, yes, Your Honor. I believe so. So isn't — how does the issue about the manuals with respect to what they were going to manufacture and their obligation to retrieve it fit into all of this? Well, Judge Carlton actually found — They really weren't forthcoming on what the policy manual required regarding recovery of the meth. Well, I don't know that that's been established, Your Honor. Help me understand what we do know. Okay. What was in the record before Judge Carlton? Well, so the section that refers to the criteria for the use of precursors, that actually consists of two different paragraphs. And in the manual itself, the — and actually, so this is docket entry 73-5, page 8. This was submitted by the government in the declaration that we submitted in support of our response. So the first sentence, or actually the second sentence in the second paragraph of that letter says, These substances should never be used in a manner in which they may chemically expose the public. And that is actually the first sentence of that paragraph, if you actually look at the policy manual. So it was actually a matter of dispute at the hearing as to what that sentence meant. We hear in this appeal that there was a coordinated attempt to mislead the court, that there was an orchestrated fraud that was perpetrated upon the court. But in fact, when Special Agent in Charge Neer testified, he said, well, he was asked about the meaning of that sentence. And he said, well, that means that you can never let the methamphetamine go out. If the precursors are used to make methamphetamine, you can't let that go out on the street. That is not what Special Agent Supervisor Largent testified to. That is not what another witness, I believe it was Agent Lunke, testified to as well. Both of them said no. And in fact, it was learned at the hearing that Special Agent Supervisor Largent actually had a role in putting together this policy. He said, no, no, no, that sentence actually means that we can't expose the public to volatile reactions from these chemicals in terms of explosions, that sort of thing. But regardless of what that sentence means, Judge Carleton found that the purpose of the policy set forth in the manual was to prevent as far as possible illegal drugs made from chemicals supplied from law enforcement being sold on the street. He says that at page 6 of his opinion. He says right after that, in his opinion, the policy's requisites gave way to events. And as he states very firmly later in the opinion, his opinion was that the agents did not conform to that part of the policy. Isn't there another policy provision that relates directly to the product meth? I don't know what you're referring to, Your Honor. There was another. I thought that was one of the arguments that they were making. It was later learned when the whole policy manual was examined, the whole document, that there was additional provisions that related to the resulting meth. If there is, it is not clear in my review of that policy, which is actually found at the whole. Let me ask you this. Why wasn't the whole manual just turned over? I don't know the answer to that question, Your Honor. Well, I'm sure, Judge, I'm sure that the State took the position that if the bad guys know our manual, they'll adjust their behavior to try to avoid it. Well, it could only be driven with protective orders and all kinds of other stuff, other kinds of protections. But they could have served a subpoena, couldn't they? I believe they could have. I reviewed our office's file with respect to that question in terms of how it came about that this information was put in the letter that was attached to the motion.  Was it filed under seal? No, it was not. No. And it's conceivable that defense counsel could have asked Judge Carlton to subpoena it the way the State judge apparently did, if it was considered that important. That's correct, Your Honor. I was not able to find in our file, in the court's file, anywhere in the hearing, anywhere in any of the pleadings that were filed, any request by the defense for anything further or additional or different in terms of the production related to the manual. Let me ask you this. In a sense, I'll preface in the same way I prefaced my question to Dr. Coke. Judge Carlton made it very clear his distaste for what had gone on and for the behavior of the B&E agents in this case. And, of course, that distaste slides over onto the government, the United States government that's prosecuting based upon this behavior. What's happening now? Well, my understanding is, as Dr. Coke actually referred to, is that B&E is not currently in existence, actually. And I confirmed that just from a former B&E special agent supervisor that I spoke with. I know that as far as, I don't know that I'm able to answer anything further, Your Honor, in terms of practices of various officers. Do you do drug cases in your office now? I do not. Okay. But I speak now only for myself. I have to say I'm deeply offended by the behavior of the B&A agents. And although it doesn't quite come in the same way, that we should have a prosecution by the federal government coming from such behavior. Well, Your Honor's statement, and I understand it to be directed towards the operation of the reversal technique. And, in fact, I would imagine that it's directed towards the release of the amount of methamphetamine. Well, it's primarily the release. I mean, we have Judge Carlton saying in his order that 102 pounds of the precursor were handed over to the spruce operation, resulting in, in his calculation, over 100,000 doses. It may actually be many more than that. But 100,000 is an awful lot to millions. I mean, it's very clear that what was going on there and was known to the federal government was a catastrophe. Well, I think that no one will dispute that any of that methamphetamine walking away and making its way into the general public is too much methamphetamine walking out the door. And I think that if you look at the transcript before Judge Carlton, Agent Diaz in particular expressed repeatedly the fact that, in fact, he was agonizing over the amount of methamphetamine that was making it out on the streets. So it was at least a subject of concern for the agents. He's agonizing only after he's called on the carpet. He wasn't agonizing very hard when he was trying to do the surveillance, which was very limited in terms of what was happening to it. Well, I don't know that that's necessarily supported by the record, Your Honor. What does the record show in terms of how much surveillance was done after the precursor was handed over? On any number of – so there were four reversals that took place. Surveillance did occur after each one of those reversals. Yes, and how long did that surveillance last on each occasion? Well, I'm going to answer it on top of my head, six to seven hours on each typical occasion. It was not 24 hours, as Special Agent and Sergeant Neer testified was his expectation. If you're going to catch some guy distributing meth by surveillance for six or seven hours a shot, you're crazy. Well, so I'm not trying to take issue with Your Honor's conclusion that there's a problem with this much methamphetamine being released into the street. I would – And I would not characterize Diaz's agonizing over this happen as agonizing at the time. To the extent that he was agonizing, he was agonizing once he was in the courtroom as to justify his behavior. Well, that was not his testimony, Your Honor. So his testimony was that he was describing his feelings as the investigation was going on. And I don't know that there's any basis to doubt him on that. Well, sometimes actions speak louder than words. I think some of the comments from some of the higher-ups in the newspaper articles that were in here, too, which were, you know, sort of dismissive of Judge Carlton, you know, those things offend us also. And I think what Judge Fletcher is saying is at some point the U.S. Attorney, even though the case may be there against these individuals, needs to exercise its discretion to say, we're not going to sanction the bad police behavior. You want to take it to state court, take it to state court. But we're the United States, and we have a little higher standards here. We certainly understand that point of view, Your Honor. And how deeply do you understand that point of view? It's easy, again, to say it now. Well, I think – You weren't in the office in 1998. No, I was not. Were you in law school in 1998? I'd just gotten out. Okay. No, this is obviously not directed at you personally. That's what we mean. But we're sending a signal to you that when you carry that title of Assistant United States Attorney, you carry a great deal of responsibility on your shoulders, too, and we expect bright young men like yourself and other assistants to really care about these things. I appreciate that, Your Honor. The only – and this follows in my mind, anyways, part of that discussion, just because in terms of what the agents testified to and what they meant when they were testifying, the assertion was made today, and it was made repeatedly in the briefs, that the methamphetamine was not – that the agents didn't go after the methamphetamine on purpose. That, in fact, they wanted it to be out there. They wanted it to be sold because the purpose of this enterprise was to make money. And in my review of the record, I am unaware of any evidence supporting that allegation. Well – Look at your possibilities. My understanding is that the allegation is that this was prolonged in order to sell it simply to generate funds, which would be coming from the sale of the methamphetamine. And I just – that is unsupported by the record here. I don't think that's true. Now, you can draw various conclusions from what is in the record, but as I read the record, at one point Diaz says, I'd like some cash, and he gets $55,000 worth of cash for the precursor. He's not asking for meth. He's asking for cash. That's right, Your Honor. Isn't that – that's an accurate statement of the record? That is accurate. However, however, that was with respect to the fourth and final reversal. Four reversals. Up to the – up before that fourth one, law enforcement received a total of $2,400 from the Spruce. So – and with that final deal, that was not set up until they were aware of or felt that they were close to being aware of where those locations were. They searched five different locations. They put together 50 people to search five locations in a period of just over three days after that final deal. So the idea that this all along was meant to generate funds, I don't believe there's any support for that. I think that to a certain extent there's aspersions being made here which are not supported by the record. Well, I guess there's a semantic argument over any evidence. There is some evidence, and it may be or may not be particularly persuasive, but I do find it somewhat distressing that when they hand over the last precursor, they don't ask for meth, but instead they ask for $55,000. Well, it's not as if they didn't ask for any meth at all. They actually received 10 pounds of meth on the date of the 13th, the day that Mr. Rowley was arrested. So if the Court has any other questions, I'm happy to try to answer them. Otherwise, I'll submit it. Thank you. Thank you, Your Honors. Very quickly, I want to point out that we've been understating the level of fraud with regard to the manual. Not only did they not produce the manual before Judge Carlton, they actually produced a letter that falsely stated, and they actually used the word paraphrase, they produced a letter to Judge Carlton's court saying that the letter accurately quote paraphrased the policy manual. Again, this manual should be on the shelves of a library. Instead, we believe it's been concealed, and we believe it's been concealed deliberately because of the knowledge of the institutional players that they had provided such false testimony. Just to make this point clear, I mean, they knew that the defense lawyers knew that the manual existed, right? At the time of the policy. That letter, that letter, you just said that they paraphrased the content of the manual. They knew that there was a manual. Why didn't they just serve a subpoena or ask Judge Carlton to order it to be disclosed? Well, I wasn't there in the case. My understanding is everybody believed the narcotics agents. Again, this was fraud on the court. Everyone thought they weren't lying. They must be telling the truth. But let me ask you this. Doesn't counsel have some obligation to sort of verify? Why would you just take somebody's statement as true? Well, listen. In discovery, you usually count on them providing stuff rather than. It says paraphrase. Well, usually. I mean, how often do you see a defense attorney demand a subpoena? All the time. Usually there's a reciprocity with discovery kind of an agreement. How would you? I don't want to. Prudent counsel? It's my experience that I have to just re-judge. I've rarely thought about subpoena. It's almost a standing order regarding discovery and turnover and whatnot. And they didn't think twice about coming to the court to ask the court's assistance to get documents that they believed were being withheld. Well, the point is we all trusted there was fraud on the court. If I could have just one minute of rebuttal also for Dr. Coke. Okay. Dr. Coke. A couple of points that attorney made that they weren't aware. Well, my goodness, the agents themselves surveilled this all the way through this operation until the day they picked it up. They knew exactly what was going on here. And not only did they supply him with ten pounds, they supplied him with an extra 55 pounds. Try and go buy 55 pounds of ephedrine. And if that wasn't enough, they made a sweet deal on the next round of 55 pounds. And they made no attempt to collect this back ever. So this was allowed to go to the street. And we as a grand jury determined by 100% vote the reason was they wanted to collect that money. The second point I want to make is that I, too, am deeply offended by the response of the U.S. attorney, who was more or less chiding us as the private citizens. My goodness, he should be on this side of the table and defending what we're doing instead of defending the illegal behavior of these B&E agents. That is more or less outrageous as a citizen of this country. And also, the U.S. attorney has allowed this to go on for ten years. How many more people are we going to allow this kind of conduct to happen and these many more addicts to be created before we can get this stopped? I thank you very much. I thank all sides for their argument. A very serious argument and a very serious matter. The United States v. Spruce is now submitted for decision. Thank you.
judges: W. Fletcher, Paez, Lasnik